FILED

2025 Nov-07  PM 04:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF  ALABAMA
## NORTHEASTERN DIVISION

|  |  |
|---|---|
| Scott Dendy, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| ANGEION GROUP LLC, EPIQ SYSTEMS, INC., JND LEGAL ADMINISTRATION, TREMENDOUS LLC, BLACKHAWK NETWORK HOLDINGS, INC., DIGITAL SETTLEMENT TECHNOLOGIES LLC d/b/a DIGITAL DISBURSEMENTS PAYMENTS, HUNTINGTON NATIONAL BANK, and WESTERN ALLIANCE BANK. | JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiff Scott Dendy ("Plaintiff"), individually and as a representative of a class of similarly situated persons, brings this action against defendants Angeion Group LLC ("Angeion"), Epiq Solutions, Inc. ("Epiq"), JND Legal Administration ("JND") (collectively referred to as "Administrator Defendants"), and Tremendous LLC ("Tremendous"), Blackhawk Network Holdings, Inc. ("Blackhawk"), and Digital Settlement Technologies LLC d/b/a Digital Disbursements Payments ("Digital Disbursements") (collectively referred to as "FinTech Defendants") in addition to Huntington National Bank ("Huntington") and Western Alliance Bank ("Western") (collectively the "Bank Defendants") (collectively the  "Administrator Defendants" and the "Bank Defendants", and the "FinTech Defendants" are referred to herein as "Defendants"), upon information and belief, including an examination and inquiry conducted by and through counsel, except as to those allegations pertaining to Plaintiff, which are alleged upon personal

belief, alleges the following for his Complaint:

## NATURE OF THE ACTION

1.      A class action, also known as a class action lawsuit, class suit, or representative action, is a type of lawsuit where one of the parties is a group of people who are represented collectively by a member or members of that group.

2.      A mass tort is a type of lawsuit filed by many individuals who have been injured by a single event or action, often involving a defective product, a large-scale accident, or some other widespread harm. Unlike class action lawsuits, mass torts involve individual lawsuits, though they are often coordinated or consolidated for efficiency.

3.      When a class action or mass tort is settled, there are ordinarily many months or even years between the time when a settlement is agreed to, and the money paid by the defendant, and the time when the money is distributed to members of the class.

4.      For example, in a class action, generally before money can be distributed, members of the class must receive notice of the settlement, be given any opportunity to object and opt out, file a claim, and have their claim reviewed and approved. The settlement must also be approved by the court presiding over the case, which involves both preliminary approval (which may or may not require a hearing) and final approval (which follows notice and an opportunity to object and virtually always requires an evidentiary hearing).

5.      If anyone objects to a settlement, which is common, and the settlement is ultimately approved, the objector has a right to appeal, and any distribution of funds must await the result of that appeal.

6.      Similarly, in a mass action, generally before money can be distributed, the parties enter into a Master Settlement Agreement (MSA) that outlines the terms of the settlement,

including the total settlement amount, the process for evaluating individual claims, and the method of distributing funds. A claims administration and distribution plan must be agreed upon and approved by the court. Each claim is assessed to determine eligibility for the settlement and claimants are allocated a pro-rata portion of the settlement based on factors like the severity of their injuries, often determined through a scoring metric or grid system outlined in the MSA. While this happens settlement funds are typically placed in a qualified settlement fund (QSF). Before funds are distributed liabilities such as liens are negotiated, there is an administrative appellate process, and the Court must approve the final distribution plan.

7.      As a result of the many steps between settlement and the distribution of the money recovered to class members and individuals in mass torts, the time required varies from several months to potentially some years.

8.      During the period between the time settlement proceeds are paid by a defendant and the time the proceeds are distributed to class members, the money must be deposited in a bank both for safe-keeping and to earn interest. Because class action and mass tort settlements often amount to hundreds of millions or billions of dollars, the amount of interest that can be earned during this time is significant.

9.      Class action and mass tort claims administrators, like the Administrator Defendants in this case, are responsible, among other things, for providing notice to class members, reviewing and approving claims, and ultimately distributing funds to class members. They also ordinarily participate in the selection of the bank where settlement funds are deposited pending distribution to class members.

10.     In a class action or mass tort settlement, a bank or escrow agent acts as an independent third party, responsible for holding settlement funds and disbursing them according

to the agreement. They ensure funds are secured.

11.    The Administrator Defendants – Epiq, JND, and Angeion, are leading providers of class action and mass tort settlement administration services in the United States (the "Administrator Market"). Together, they control over 65% of the Administrator Market. As the entities appointed by the Courts to administrate the disbursement of class settlement funds to class members, the Administrator Defendants have a direct relationship with the Courts and class members, as their duly appointed fiduciaries.

12.    Plaintiff brings this action against the Administrator Defendants, for engaging in a manipulative and deceptive scheme to obtain millions of dollars in undisclosed compensation for serving as the court-approved settlement administrators in mass tort and class action lawsuits across the country. Some time during  2021 – when the interest rates in the United States started rising – Administrator Defendants entered into an ongoing agreement with each other to increase the cost and price of class administration services, including by having Bank Defendants pay them the interest and investments earned on class action settlement deposits that would have otherwise been distributed to class member and used to pay down the cost of class administration services.

13.    In their bids, proposals, and agreements for providing settlement administration services, the Administrator Defendants represent the amount of compensation they expect to receive from providing such services. However, unbeknownst to Plaintiff, Class Members and the courts, Defendants reap significant profits from so-called "revenue sharing" payments for using digital payment cards and gift cards, which they distribute to class members. In reality, these revenue sharing payments are nothing more than kickbacks received from the FinTech Defendants.

14.    These kickbacks are generated from rebates and revenue sharing arrangements with digital payment companies that cash in on so-called "breakage" – a term used to describe revenue

gained by digital payment companies through unredeemed gift cards and digital pay cards that are never claimed.

15.     In order to induce settlement administrators to use digital payment platforms, FinTech companies and bank subsidiaries, including defendants Blackhawk and Tremendous and Digital Disbursements, share a portion of the breakage with settlement administrators like Defendants. Defendants have failed to disclose these kickbacks to Plaintiff, Class Members, or the courts. Instead, Administrator Defendants have taken measures, including forming special purpose entities ("SPEs") to conceal their receipt of kickbacks from the FinTech Defendants. Administrator Defendants simply pocket the money, nearly all of which is pure profit.

16.     Indeed, Todd B. Hilsee, who has published a white paper on class action notice and claims processes for 34 years has written and published a white paper entitled, "Information on Potentially Deceptive Banking and Claims Administration Practices in Class Action Settlement 'Digital Payment' Distribution and Reporting re: Allege Systematic Misappropriation of Qualified Settlement Fund Money Without Court Approval," on October 16, 2024, confirming the allegations in Plaintiff's complaint and adding details.[1]

17.     Separately, journalist Jeff Kauflin confirmed allegations in the complaint in an article published by *Forbes* on May 21, 2025.[2] In the article, *Forbes* "estimates that over the past

---

[1] *See* Hilsee, Todd B., "Information on Potentially Deceptive Banking and Claims Administration Practices in Class Action Settlement "Digital Payment" Distribution and Reporting re: Allege Systematic Misappropriation of Qualified Settlement Fund Money Without Court Approval," October 16, 2024 *available at:* chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.hilseegroup.org/wp-content/uploads/2024/10/Hilsee-DP_QSF-White-Paper.pdf (last visited May 21, 2025) (hereinafter "Hilsee Report").

[2] *See* Jeff Kauflin, "Online prepaid cards have proliferated as a way to compensate consumers harmed by companies. Critics say fintechs and claims administrators have unfairly profited from the trend." Forbes, May 21, 2025, FORBES, *available at:* https://www.forbes.com/sites/jeffkauflin/2025/05/21/how-private-equity-owned-companies-quietly-pocket-class-action-payouts/ (last visited May 21, 2025) (hereinafter "Forbes").

five years, $300 to $400 million of damages distributed to injured consumers through digital prepaid cards has been left unspent." And, "unused money doesn't go back to the settlement fund or to not-for-profits working in areas related to the suit, as it usually does when paper settlement checks aren't cashed or when a recipient never activates the card. . . . Instead, the unused funds end up lining the pockets of the FinTech companies that issue the card (mainly gift card giant Blackhawk Network and New York startup Tremendous), the banks they partner with and the very class action administration companies that award the contracts for the digital cards."

18.     Additionally, the Administrator Defendants engaged in a deceptive and anticompetitive scheme to reap hundreds of millions of dollars in undisclosed kickbacks and compensation from the Bank Defendants, while increasing the costs and depressing the payouts of class actions and mass torts. Some time on or about 2021 – when the interest rates in the United States started rising – Administrator Defendants entered into an ongoing agreement with each other to increase the cost and price of class administration services, including by having Bank Defendants pay them the interest and investments earned on class action settlement deposits that would have otherwise been distributed to class members and used to pay down the cost of class administration services.

19.     This was also confirmed by Mr. Hilsee, who stated the bank "told me that Admins were asking banks to share the interest a QSF account would otherwise earn. This occurred, it was explained to me, because courts and counsel were not informed of fully available interest rates, had no reason to question interest rates during the recent pas low-interest rate environment, and counsel and courts increasingly rely on Administrators to handle more settlement duties."[3]

---

[3] *Hilsee Report*, supra note 4.

20.     Defendant Huntington's parent company Huntington Bancshares Inc. (Nasdaq: HBAN) and Defendant Western's parent company Western Alliance Bancorporation (NYSE: WAL) are publicly traded companies. Defendant Huntington and Defendant Western are federally chartered banks. Together the Bank Defendants control over eighty percent (>80%) of the settlement funds in class and mass actions (herein after the "Settlement Deposit Market") in the United States. Like the Administrator Defendants, the Bank Defendants are fiduciaries of the class members in thousands of class and mass actions every year, duly appointed and supervised by the Courts.

21.     To maintain their market power in the Settlement Deposit Market, the Bank Defendants agreed to work with the Administrator Defendants looking to increase the cost and price of class administration services and pay the Administrator Defendants the kickbacks. In exchange, the Administrator Defendants agreed to keep all of the settlement funds from the thousands of class actions and mass torts with the Bank Defendants. The Bank Defendants thereby maintained their power in the Settlement Deposit Market, leading to steady profits and liquidity for the Bank Defendants.

22.     The Bank Defendants thereby conspired with the Administrator Defendants, and entered into these agreements deliberately, corruptly, and with intent to execute the kickback scheme. Indeed, the Administrator Defendants took cautious measures to conceal their receipt of kickbacks, including by forming special purpose entities ("SPEs") to facilitate the kickback scheme. For their part, the Bank Defendants paid the kickbacks into these SPEs, which they knew was for the purpose of sending kickback payments to the Administrator Defendants without

detection. This arrangement has continued for years, including throughout the class period, without any disclosure to the Courts, Plaintiff and Class Members to whom the Defendants are fiduciaries.

23.     The kickback scheme perpetuated by the Defendants is the epitome of self-dealing. Plaintiff brings this action to bring an end to Defendants' clandestine practices, enjoin them from continued use of the kickbacks for their own benefit, to compensate the class members for the harm caused by Defendants' illegal conduct, and to stop the anticompetitive practices that the Defendants have carried on, which has depressed payouts substantially in class actions in the United States.

24.     Plaintiff brings this action to bring to light Defendants' clandestine practices, to enjoin them from continuing to use kickbacks and anti-competitive behavior, to obtain an accounting of Defendants' ill-gotten gains, and to compensate the class members for the harm caused by Defendants' improper conduct.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d). The amount in controversy in this Class Action exceeds $5,000,000, exclusive of interest and costs, and Plaintiff as well as numerous Class Members are citizens of states other than the state of Defendants' citizenship.

26.     This Court has personal jurisdiction over Defendants because they are corporations that regularly conduct business in this District. Defendants' conduct involves thousands of class action settlements that were litigated, settled, or administered in this state, harming millions of citizens of this state. At all times relevant, the State of Alabama had a large number of class action settlements. Defendants were all involved in hundreds of class actions in states including Alabama as administrators and trustee banks.

27.    Further this Court has jurisdiction under RICO pursuant to 18 U.S.C. § 1964.

28.    Venue is proper in this District under 28 U.S.C. §1391(b) because Defendants regularly conduct business in this District.

## THE PARTIES

29.    Plaintiff, Scott Dendy, a citizen of Alabama, was a class member in the *In re: Equifax, Inc. Customer Data Security Breach Litigation*, Case No. 1:17-md-02800-TWT (N.D. Ga.) class action case that resulted in a $380.5 million settlement administered by Defendant JND.

30.    In connection with this settlement, Plaintiff received class and mass action settlement disbursements from Defendant JND. Unbeknownst to Plaintiff and the Class Members, Administrator Defendants, and/or their subsidiaries and affiliates, received remuneration, compensation or incentives from the issuer of these digital payments and siphoned undisclosed compensation from the Bank Defendants from the settlement funds, none of which were disclosed to the Courts, Plaintiff or Class Members. Neither Plaintiff nor the settlement classes of which they were members received any benefit from the kickbacks paid to Administrator Defendants.

31.    Defendant Angeion is a class action administration company that maintains its principal executive offices at 1650 Arch Street, Suite 2210, Philadelphia, Pennsylvania 19103. Angeion was one of the first settlement administrators to adopt digital payment methods. On its website, Angeion states that from 2014 to 2016, it "pushe[d] for industry change, advocating for modern communication and **digital payments that eliminate the need for check-cashing stores**." (Emphasis added.)[4] These efforts appear to have paid off, as its website boasts, "In 2022 alone, Angeion sends over 300 million electronic notices to class members and distributes over **10**

---

[4] *See* https://www.angeiongroup.com/about (last visited on April 23, 2025).

9

**million digital disbursements**." (Emphasis added.)[5] And for 2024, Defendant Angeion projected that it would "distribute over 20 million digital disbursements."[6]

32.    Defendant Epiq is a Delaware corporation that maintains its principal executive offices at 501 Kansas Avenue, Kansas City, Kansas 66105. Defendant Epiq is one of the largest settlement administration companies in the country. Plaintiff is informed, and on that basis believes and alleges, that Epiq's market share in the Administrator Market is approximately 50%.[7]

33.    Defendant JND, a subsidiary of Sedgwick, is a class action administration company that maintains its principal executive offices at 1201 2nd Ave Suite 3400, Seattle, Washington 98101. JND's class action services include pre-settlement consultation, notice services, claims processing and validation, call center capabilities, settlement website design, and "an array of distribution services."[8] Pertinent to the instant case, "JND has disbursed billions of dollars in settlement benefits in a wide variety of forms," including "gift cards, vouchers, and electronic benefits."[9]

34.    Defendant Blackhawk is a prepaid payment network utilizing proprietary technology to offer consumers and businesses a broad range of prepaid cards in physical and electronic forms, as well as related prepaid products, payment services, and incentive solutions. Blackhawk's principal place of business is 6220 Stoneridge Mall Road, Pleasanton, California 94588, and it is incorporated in Delaware. In 2013, the company filed for a $200 million IPO on NASDAQ. Then on January 16, 2018, Blackhawk announced that it would be acquired by Silver

---

[5] *Id*.

[6] *Id*.

[7] *See e.g*., https://www.issgovernance.com/library/the-top-100-us-class-action-settlements-of-all-time-as-of-december-2023/ (last visited June 10, 2025).

[8] *See* https://www.jndla.com/class-action-administration (last visited April 23, 2025).

[9] *Id*.

Lake and P2 Capital Partners for $3.5 billion. Blackhawk now operates as an American privately held company that operates in the prepaid, gift card and payments industries.

35.     Defendant Tremendous operates as a payouts platform that allows businesses to send money, prepaid cards, and gift cards to recipients globally. Tremendous is incorporated in New York. The company maintains its headquarters at 228 Park Ave S PMB 62949, New York, New York 10003-1502. According to this website: "We bulked up our engineering, customer success, and support to expand our technical and business capacity. By 2024, we'd grown past 100 employees in six countries, powering over 1 billion payouts for more than 10,000 businesses."[10]

36.     Defendant Digital Settlement Technologies LLC located at 520 Broadway, Suite 200, Santa Monica, California 90401, doing business as Digital Disbursements Payments, was launched in 2019 and acquired by, and now is a subsidiary of, Western Alliance Bank. Digital Disbursements focuses on providing digital payment solutions, particularly for mass payouts in industries like legal and financial services.

37.     Defendant Huntington is a regional bank holding company that is FDIC insured and federally chartered, maintaining its principal executive offices in Columbus, Ohio. Defendant Huntington is a subsidiary of the publicly traded company Huntington Bancshares Inc. (NASDAQ stock symbol HBAN). Defendant Huntington is one of two major banks in the Settlement Deposit Market, with the largest market share in that market.

38.     Defendant Western is a federally chartered bank and is a subsidiary of a publicly traded company, Western Alliance Bancorporation (NYSE stock symbol WAL), that maintains its principal executive offices in Phoenix, Arizona. Defendant Western is one of two major banks in the Settlement Deposit Market, with the largest market share in that market.

---

[10] *See* Tremendous, *available at* https://www.tremendous.com/company-history/ (last visited May 21, 2025).

## SUBSTANTIVE ALLEGATIONS

*Class Action Settlement Administration Businesses*

39.    The Administrator Defendants are routinely retained by Plaintiff and Class Members, subject to court approval, to provide settlement administration services in class actions and mass tort cases.

40.    This is in part because it is more efficient for courts to outsource the administering and managing of class action settlements (e.g., mass mailing millions of class members, answering all of their questions, etc.). When there is a class settlement, class members are entitled to know the terms of the settlement offered to the class by the defendant, ask questions about the case and settlement, and review all documents relating to the proposed settlement. The courts have neither the resources nor the staff to answer the questions and provide the support needed by hundreds of millions of consumers that are part of class actions every year.

41.    The class action administration industry therefore grew into a multibillion-dollar industry to support the courts and class action litigants, where administrators advertise their skills and integrity as fiduciaries for class members, acting under the supervision of the courts.

42.    Defendant Epiq, advertises itself on its webpage as the "best-in-class" administrator to consumers and the Courts, allegedly providing clients "clarity" and "confidence".[11]

43.    Epic also claims that its administration services ensure "accuracy and efficiency".[12]

44.    Similarly, Defendant JND claims that it is one of the largest and most trusted administrators in the industry.[13]

---

[11]  https://www.epiqglobal.com/en-us/services/class-action-mass-tort/class-action-administration (last visited June 10, 2025).

[12]                https://www.epiqglobal.com/en-us/services/class-action-mass-tort/class-action-administration/claims-administration (last visited June 10, 2025).

[13] https://www.jndla.com/about-us#jnd-fact-sheets (last visited June 10, 2025).

45.     Defendant Angeion publicly advertises itself as an "efficient" and trusted "industry leader" amongst class action administrators.[14]

46.     Administrator Defendants' settlement administration responsibilities and services include (i) gathering and managing data related to class members; (ii) sending out notices to class members to inform them about the terms of the settlement and their options (e.g., submitting a claim, opting out of the settlement class, objecting to the settlement and/or appearing at the final fairness hearing); (iii) receiving and reviewing claim forms submitted by class members; (iv) verifying claimants' eligibility to participate in the settlement; (v) ensuring compliance with court orders; (vi) management of the Qualified Settlement Fund ("QSF") established under Treasury Regulation § 1.468B3(e)(2)(ii), also known as a "Section 468B trust," including opening accounts, reconciling accounts, fund recordkeeping, and ensuring proper tax reporting; and (vii) distributing the settlement funds to eligible class members, typically through checks or other payment methods.

47.     Defendants, as the custodians and administrators of the QSFs, are fiduciaries. As fiduciaries, Defendants have legal and ethical obligations to act in the best interests of the beneficiaries (i.e., the Plaintiff and the class) of the QSF and ensure the funds are managed responsibly and in accordance with the settlement agreement and applicable regulations. See, e.g., *Nolte v. Cigna Corp.*, No. 07-2046, 2013 WL 3586645, at *4 (C.D. Ill. July 3, 2013) (stating, "The oversight of the Settlement Fund is the responsibility of the Settlement Administrator.")

48.     To complete the class administration of class actions and mass actions, class counsel often solicits competing bids from several class administrators. This is because the costs of claims administration are typically paid out of the total settlement fund. Thus, payments made to class administrators diminishes the funds available for distribution to the class members. In most

---

[14] https://www.angeiongroup.com/class-action/claims-administration (last visited June 10, 2025).

cases, the compensation paid to the class administrator is one of the largest expenses of settlement administration. Thus, to secure their court appointments, Administrator Defendants must submit detailed proposals that describe the scope of services they provide and the supposed associated costs. These are reviewed and approved directly by the court as part of the "preliminary approval" and "final approval" processes in class action settlements, only after the court reviews and agrees that what the class administrator proposed is a competitive proposal.

49.     The Administrator Market is a relevant and unique market because class action administrators provide specialized expertise and skills that others cannot readily provide. Class actions can present complicated problems, especially when it comes to large scale class actions with tens of millions of class members. Class settlements may have varied and tight deadlines for specific industries or peculiar notices. Administrators need to know how to handle huge volumes of incoming calls and questions, answering them accurately and within the parameters of the settlement. Administrators need to know how to assess objections, fill out forms, and when additional questions need to be asked of the counsel or court. And administrators need to know how to accurately disburse and track the tens to hundreds of thousands of claim payments made.

50.     The Administrator Defendants together – specifically Epiq, Angeion, and JND – control well-over more than 65% of the market share of class action administration services. They are recognized as household names in the class action administration industry. The Administrator Defendants dominate popular class action websites such as www.classaction.org, where they typically have to post notices and provide documents.

***The Qualified Settlement Fund Accounts Industry & the Bank Defendants***

51.     As further described herein, the Administrator Defendants were financially motivated to refer most of their class action settlement deposits to the Bank Defendants (and not

the Bank Defendants' competitors), because both groups were financially motivated to maintain their anticompetitive and deceptive scheme.

52.     The Settlement Deposit Market is a relevant and unique market because handling Section 468B trust-accounts requires expertise and class action experience. Managing such trusts requires large quantities of disbursements at scale, and the pertinent IRS-regulations demand special handling throughout the life of the deposit. Once a class settlement is approved, the trustee bank typically has to cut thousands to hundreds of thousands of checks or distribute other forms of payments quickly and accurately, while complying with the strict requirements imposed by the court orders and the IRS, in addition to class action administrator instructions.

53.     This requires a scale and expertise that most banks do not have. Investment in the practice must be made for any competing bank to meet the rigorous requirements and demands of how QSF accounts are used for class action settlements.

54.     The Bank Defendants' settlement deposit services in the Settlement Deposit Market include: (a) setting up and managing the QSFs funds (i.e., A Section 468B trust) established under Treasury Regulation § 1.468B3(e)(2)(ii), including opening accounts, reconciling accounts, fund recordkeeping, and ensuring proper tax reporting; (b) investing the QSF funds, and managing the investments properly; (c) regularly reporting to the class administrators and Courts (both directly and indirectly through the class administrators); (d) cutting checks and/or issuing payments selected by the class members; (e) managing and reconciling the QSF fund during the class member deposit and redemption process; and (f) paying out interests and other returns on the deposits and investments, during reconciliation and reporting to the supervising courts.

55.     The need for scale and scalability is a barrier of entry in the Settlement Deposit Market. To cut thousands to hundreds of thousands of checks and distribute other payments

quickly and accurately, banks not only need to invest in technology, but qualified staff. The technology and staff also need many accounts and disbursements to sustain them, because such large teams need to be sustained with steady work to stay profitable.

56.     That scale and scalability are critical as evidenced by how both Defendants Huntington and Western typically oversee thousands of class action QSF-accounts at any given time. Plaintiff and counsel are informed, and on that basis believe and allege, that no other banks have as many QSF-accounts as Defendants Huntington and Western, who together control over 80% of the market.

57.     Another important barrier to entry into the Settlement Deposit Market is the long-standing relationship between class action administrators and trustee banks. The major class administrators tend to be responsible for hundreds, if not thousands of class actions, at the same time. If any major administrator has a long-standing relationship with a trustee bank, the referral relationship can present a major barrier of entry to new entrants.

58.     In addition, partially due to the unprecedented low interest rates between 2010 and 2020, the number of banks competing for QSF accounts had dwindled, leaving primarily the duopoly of Defendants Huntington and Western intact. Scale ensured viability and profitability when interest rates were low.

59.     Once interest rates increased quickly in the United States, starting in or about 2021, the Bank Defendants were highly motivated to maintain their substantially increased profits and market power, including by acting in concert to fix and maintain returns on QSF accounts.

60.     Nonetheless, the Bank Defendants recognize the fiduciary nature of their role in the class action settlement process. For example, Defendant Huntington in its marketing materials

discusses its "extensive experience" while recognizing that it takes on a "fiduciary role" in each and every case.[15]

61.    Defendant Western, for example, advertises that its administration team offers "exceptional service…and integrity" in the provision of QSF account services.[16]

***The Class Action Settlement Fiduciary Selection Process: Preliminary and Final Approvals***

62.    Class action settlements are typically deposited into a QSF, in the custody of a trustee bank, to be administered by a class action administrator, subject to direct oversight and review by the court.

63.    To select the fiduciaries to administer and dispense the settlement, class counsel typically solicits competing bids from class administrators and trustee banks. These bids would often come in the form of competing term sheets. The terms are not binding on the class members or courts, because it is the supervising court who must ultimately review and approve the terms proposed as part of the "preliminary approval" and "final approval" class action process.

64.    Specifically, upon a class action settlement, the parties would typically first apply to the court presiding over the litigation for preliminary approval. The court reviews all material terms of the settlement agreement, on behalf of the settlement class. When a class administrator and trustee bank for the QSF funds are proposed, the court requires that the parties involved fully disclose all material terms for their appointment. Only then can the proposed terms of the class administrator be approved.

65.    If a court finds a settlement agreement submitted preliminarily agreeable, it will issue an Order of preliminary approval on the condition that the class be notified of the terms of

---

[15]  https://www.huntington.com/Commercial/industries/settlement-funds-services  (last  visited June 10, 2025).
[16]          https://www.westernalliancebancorporation.com/industry-expertise/legal#3159568222-1752007178 (last visited June 10, 2025).

the settlement, and be given an opportunity to review the settlement, ask questions, and object if necessary. As part of this preliminary approval the court would appoint a class action administrator and trustee bank for the QSF funds, as fiduciaries for the settlement class. The administrator would be responsible for handling the administration of the settlement, and the trustee bank would be responsible for holding and ultimately distributing the QSF funds.

66.     If the class members object to the settlement, the court will hear and consider the objections. If the class members do not object, or if objections are otherwise overruled, the court will proceed onto a review and hearing for final approval of the settlement.

67.     Between the issuance of preliminary approval order and the final approval hearing, class members receive notice regarding the proposed settlement through the class administrator. The notices are supposed to include all material terms and conditions of the proposed settlement, so that the class members can review, assess, and ask questions. The notices are sent in some combination of postal mail and electronic mail ("Mail Notices"), in addition to publication by websites ("Website Notices") and/or newspapers of general circulation.

68.     Sometimes, when the courts consider objections raised, the settlement funds sit in the QSFs longer than the parties anticipated. The objections may lead to additional litigation, hearings, and appeal. During this time, the deposited funds are supposed to accrue interest or otherwise be invested to increase value, for the benefit of the class.

69.     As part of this approval process, the Administrator Defendants are almost always required to send notices to the State Attorney Generals (AGs), pursuant to the Class Action Fairness Act (CAFA), 28 U.S.C. §§ 1332. The terms of the settlement, including all material terms, are supposed to be disclosed to the AGs, so that any AG may object to a settlement it finds unreasonable. If an AG chooses to object – such as if it had found that there was an illegal and

unconscionable payment to a party or third-party – the AG or a coalition of AGs may file objections with the reviewing court, or appear at the final approval hearing to explain their objections.

70.     Once the time to object has lapsed and objections have otherwise been disposed of, the court prepares its final approval after the conclusion of the final approval hearing. The court conducts a careful review of not just the material terms of settlement, but also reports from the class administrator and the trustee bank holding the QSFs. The trustee bank provides a final account on the QSF to the class administrator, supposedly containing all costs and fees incurred, which is then submitted to the court for final approval.

***The Rise of the Digital Payment Market in Class Actions and Mass Torts***

71.     Effective December 1, 2018, the Federal Rules of Civil Procedure were amended, and one notable change significantly impacted class action lawsuit procedures, specifically regarding email notice under Rule 23(c)(2)(B).

72.     The amended Rule 23(c)(2)(B) explicitly allows for the use of "electronic means" to provide notice to class members, including email, in addition to traditional methods like mail. This was a significant shift, recognizing the growing prevalence of electronic communication.

73.     The rule still mandates that class members receive the "best notice that is practicable under the circumstances," but now acknowledges email as a potentially effective means of delivering this notice. This requires courts to consider the specific circumstances of each case when determining the most appropriate method of notice.

74.     Since that time, settlement administrators, banks, and FinTech companies have promoted class action and mass tort settlement payment distribution by digital means to lawyers, government agencies, and courts. Today, both digital payment and email notice are prevalent.

75.     Sine approximately 2019, FinTechs have marketed digital payments for settlement distributions as less costly, more efficient, less risky, serving the "unbanked" and preferred by recipients.[17]

76.     Blackhawk noted in March 2022, that: "Prepaid cards are more effective solutions than checks when it comes to paying out class action lawsuits and offer cost saving solutions from start to finish. Streamlining the payout process can help businesses in a multitude of ways, and attorneys and administrators should consider switching to prepaid cards to do so."[18]

77.     An article from Western and Digital Disbursements states, "Among the key findings of the inaugural Digital Payments in Class Actions and Mass Torts report: When claimants are offered a broad pay menu, the success rate for digital payments is 98%. That compares to a weighted average check cash rate of only 77% in cases with a claims process and only 55% in cases without a claims process, according to a 2019 study by the Federal Trade Commission."[19]

78.     Banks and settlement administrators have published articles highlighting the benefits of digital payments in class actions and mass torts, including:

(a)     "Modern life increasingly relies on digital solutions. Nothing has made that more apparent than the novel coronavirus pandemic. In terms of class action settlement payments,

---

[17] *See, e.g.,* https://www.westernalliancebancorporation.com/news/western-alliance-acquires-digital-disbursements (last visited June 10, 2025).

[18] https://today.westlaw.com/Document/I5a82f484b0f511ec9f24ec7b211d8087/View/FullText.html?transitionType=Default&contextData=(sc.Default)&firstPage=true (last visited June 10, 2025).

[19] https://www.westernalliancebancorporation.com/industry-expertise/legal/2023-digital-payments-report (last visited June 10, 2025).

the impetus has never been greater to transition to the e-payment realm for security, convenience, cost-reduction, and improved fund disbursement."[20]

(b)    "On the other hand, digital payment tools have driven down the cost of distributing proceeds to the class, leaving fewer and fewer instances where cy pres makes the most economic sense."[21]

(c)    "Distributing individual prepaid VISA cards is a worthy alternative to checks for providing benefits to class members. The PYMNTS.com study found an estimated 833,000 consumers would have liked to receive disbursements via debit card, and more than 1.6 million would have preferred them via prepaid card in 2018."[22]

79.    Government, courts, and academics echo the benefits of digital payment. A "Class Action Study" of notice efficacy and claims rates was released in 2019 by the Federal Trade Commission ("FTC").[23]

80.    In conjunction with this Study, a workshop was held by the FTC which included a discussion by claims administrators and others on the benefits of digital payment.[24]

81.    The period thereafter began the proliferation of digital payment in class actions and mass torts.

---

[20]    https://litigationconferences.com/digital-payments-best-practices-for-efficiency-in-class-actions/ (last visited June 10, 2025).

[21]    chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.westernalliancebancorporation.com/sites/default/files/2022-04/Cy%20Pres%2C%20Objectors%2C%20Quick-Pay%20Research.pdf (last visited June 10, 2025).

[22]    https://www.kroll.com/en/insights/publications/settlement-administration/electronic-payments-in-class-action-settlements (last visited June 10, 2025).

[23]    https://www.ftc.gov/reports/consumers-class-actions-retrospective-analysis-settlement-campaigns (last visited June 10, 2025).

[24]    https://www.ftc.gov/news-events/events/2019/10/consumers-class-action-notices-ftc-workshop (last visited June 10, 2025).

82.     Indeed, a draft "Guidelines and Best Practices in Class Actions" published by the James F. Humphreys Complex Litigation Center of the George Washington Law School soon followed in October of 2021. A class action digital payment FinTech (Western Alliance) was listed in the draft as a "Founding Patron" of the Center and also identified contributors that included banks (Huntington Bank, Western Alliance), FinTechs (Digital Disbursements), and claims administrators (Angeion).[25]

83.     The "Guidelines" pertaining to digital payment in class actions include:

(a)     "The efficacy and cost of digital payments vary by method, but they usually are more effective and less expensive than paper checks." (*Id.* at Page 26.)

(b)     "The increasing digitization of payments in the United States and globally suggests that payment methods other than by paper checks may be more effective in distributing relief, particularly when class members are individuals. Staying abreast of the wide variety and frequent emergence of new digital payment methods requires dedicated attention. Settlement administrators and banks with class-action experience have the knowledge and expertise necessary to make informed judgments." (*Id.* at Page 28.)

(c)     "Virtual and physical prepaid cards and retail gift cards are particularly effective methods for making payments to unbanked individuals. Some prepaid cards can be added to digital wallets and used with Apple Pay, Samsung Pay, Google Pay, and other platforms." (*Id.* at Page 26.)

(d)     "Although the actual effectiveness of any payment method cannot be known until after the court approves the settlement, the parties should provide information at the

---

[25] *See* Humphreys Class Action Guidelines and Best Practices, https://www.law.gwu.edu/humphreys-complex-litigation-center-publications (last visited June 11, 2025).

preliminary-approval stage, including estimates of costs and projected efficacy, sufficient for the court to find that the effectiveness of the payment method is adequate." (*Id*. at Page 28.)

84.     The change in the rules to allow for electronic notice unlocked the door for digital payments and allowed for the scheme alleged herein to occur. That is for the undisclosed diversion of compensation, incentives, and remuneration to flow to the Administrator Defendants.

***Rising Profits for Defendants in 2021, and the Birth of an Anticompetitive Scheme***

85.     While it is unknown how long the Bank Defendants have been providing undisclosed benefits to the Administrator Defendants, Plaintiff and counsel are informed, and on that basis believe and allege, the Defendants' anticompetitive scheme began sometime around 2021, resulting from the sudden rise of interest rates.

86.     Sometime around 2021, the potential for substantial profit on the QSF deposits became clear to the Bank Defendants. There were billions of dollars in potential deposits available from class action and mass tort settlements every year, and the Administrator Defendants demanded that they be given a cut of the profits, in the form of a guaranteed rate of return on the deposit, that would be lower than the floating federal window interest rate. If the Bank Defendants refused, the Administrator Defendants threatened to pull their fleet of class settlements from them.

87.     The Administrator Defendants agreed with each other that they would implement such a scheme, and each of them proceeded to act accordingly, in concert with one another. Indeed, during the times relevant, each of them made such demands on the Bank Defendants, received illegal and unfair remunerations from the Bank Defendants, and proceeded to hide these illicit transactions for themselves, and for each other.

88.     One of the important effects of these concerted actions by the Administrator Defendants is that it raised the price of class action settlement administration services and lowered

the total payouts to class members. Had the secret remunerations to the Administrator Defendants not been made, more money would have been paid to Plaintiff and Class Members, either as a result of reduced costs of administration or in the form of higher interest payments, or both.

89.    To meet the Administrator Defendants' demands, the Bank Defendants also passed off the costs to the class members who have a right to the QSF deposits (and any accruing interest), by uniformly offering class members below-market interest rates, often at rates lower than 0.5%. The rates provided by the Bank Defendants would have been significantly higher in a competitive market absent such collusion.

90.    Other lawsuits allege that the anticompetitive scheme had the further effect of depressing interest rates in the Administration Deposit Market for the few class actions where interest rates higher than 0.5% per year were paid. The rates on those cases were still ultimately lower than what the rates would have been in a competitive market, because the Bank Defendants not only had to act in concert, but were afraid that non-participants and customers would find out about their anticompetitive scheme. Thus, and even then, the Bank Defendants continued to collude and report the same interest rate offered for prospective QSFs.

91.    Defendants agreed to a scheme whereby: (a) the Bank Defendants would pay the Administrator Defendants a substantial portion of the difference between the interest rate reported on the QSF deposit, and the market interest rate; (b) the Administrator Defendants agreed in exchange to keep all of their class action settlement deposits with the two Bank Defendants; (c) the Bank Defendants would provide identical or near-identical bids, amounting to a substantially depressed interest rate for class members, on all QSF deposits, and maintain those interest rates thereafter; and (d) deposit the kickbacks into SPEs separately created by the Administrator Defendants to hide the scheme.

*Administrator Defendants' Illicit Receipt of Kickbacks from Digital Pay Card Issuers*

92.    Unbeknownst to the Plaintiff and Class Members who have retained Administrator Defendants as administrators to provide settlement administration services and the courts who have approved of the selection of Administrator Defendants as administrators, the amount of compensation Administrator Defendants receive for providing settlement administration services is secretly augmented by remuneration, compensation and incentives they receive from issuers of digital payment cards and gift cards. This results in Administrator Defendants' receipt of compensation that significantly exceeds the amounts they have disclosed to the parties and the courts.

93.    As noted above, Administrator Defendants serve in a fiduciary capacity as the trustee and custodian of the QSF, which they are obligated to manage, supervise, and administer for the benefit of the class.

94.    Until in or around 2018 payments in virtually all class action and mass tort settlements went out by mail in the form of a paper check, which required claims administrators, like Administrator Defendants, to print, mail, and track tens of thousands (or hundreds of thousands) of checks. This was followed by stale-dating and/or reissuing a significant portion of the checks that went uncashed. Payees, for their part, needed a mailing address to receive checks and a way to cash them, which excluded those without fixed residences or bank accounts.

95.    Typical final approval orders in class action settlements indicate that after about a 180-day period, uncashed checks will be redistributed by the QSF back to the settlement class if economically feasible on a *pro rata* basis.

96.    In recent years, however, settlement administrators, like Administrator Defendants, have transitioned away from issuing checks to class members to mailing (or emailing) digital

disbursements, including prepaid cards and gift cards. According to one report, "The number of times digital payments are selected is growing at a faster rate than the number of cases in which digital payments are offered. From 2020 to 2022, the number of cases grew by a factor of 10, while the number of payment selections grew by a factor of more than 68."[26]

97.    Digital disbursements are touted for having higher payment success rates than paper checks.[27] Also, issuers of digital payments report that payees generally prefer digital payments. For example, they report that in cases where payees have a choice between paper checks and digital payments, as much as 91 percent of class members have elected to receive a digital payment.[28]

98.    Digital payments are also touted for having a lower cost to send a payment to a U.S.-based payee than the cost to print and mail a paper check.

99.    Defendants' digital payments are outsourced to FinTech firms and/or subsidiaries of banks, such as the FinTech Defendants, that issue all the prepaid cards and gift cards for a particular settlement.

100.    Generally speaking, there are two types of digital payment cards: open-loop and closed-loop.

(a)    A closed-loop card is a digital payment card that can only be used at a specific retailer or company. The card will typically display the company's logo, such as Amazon or Target, indicating where it is accepted, but not the logo of a card network, such as MasterCard or Visa.

---

[26] *See 2023 ANNUAL REPORT, Digital Payments in Class Actions and Mass Torts*, at p. 7, available at https://www.westernalliancebancorporation.com/sites/default/files/2023-10/2023-wab-dd-digital-payments-report.pdf (last visited on April 23, 2024).

[27] *See id.* at p. 5.

[28] *See id.* at p. 8.

(b)    An open-loop card is a general-purpose digital payment card that can be used anywhere the brand of card is accepted. It typically bears the logo of the card brand or network that processes the actual transactions, such as Visa, Mastercard, American Express, or Discover.

101.    FinTech companies that issue closed-loop payment cards receive substantial rebates from the retailer where the card can be used. For example, if a FinTech company obtains cards from Amazon, Amazon will provide a rebate to the digital pay card issuer (*e.g.*, offering a $10 rebate on a $100 digital pay card). Digital pay card issuers, who compete for business from class action settlement administration companies, split the $10 rebate with the settlement administrator. In the example of the $100 Amazon pay card, the digital pay card company retains half of the rebate (*i.e.*, $5), and it kicks back the other $5 to the Administrator Defendants.

102.    For open-loop digital pay cards, the rebates are smaller, and it takes longer for the rebates to accrue. However, even a one or two percent rebate on a multimillion-dollar settlement results in substantial compensation for the Administrator Defendants.

103.    The issuers of digital payment cards are able to offer such rebates because of "breakage," which is a term used in the industry to describe revenue gained by retailers through unredeemed gift cards and digital payment cards that are never claimed. In these cases, the retailers pocket the money paid for these prepaid cards. Nearly all of this money is considered to be profit for the retailers. And the profits are enormous. "Forbes estimates that over the past five years, $300 to $400 million of damages distributed to injured consumers through digital prepaid cards has been left unspent…."[29]

---

[29] *Forbes*, *supra* note 2.

104.    The profits from breakage enable FinTech companies, like FinTech Defendants, to promote their digital payment cards as a no-cost service. For example, on its LinkedIn page, Tremendous states, "Plus, **we're free to use**. You only spend what you send." (Emphasis added.)[30]

105.    As an example of how breakage works, if a customer purchases a $50 gift card, the company receives $50, as well as a future liability for $50 worth of goods or services. This could be for a clothing retailer, a restaurant chain, or any other merchant that offers such gift card programs. If the recipient of the gift card uses it to make a $47 purchase, then the company would remove $47 from its liability, which would be recognized as revenue. If, after the purchase, the customer discards the gift card, the $3 left on it would never be used. That leftover amount is considered breakage.

106.    In the Hilsee Report, Hilsee states he was informed by an industry insider: "To issue $100 to a claimant by Digitalcard, the FinTech does not require the whole amount, because of the significant breakage. However, the entire $100 is transferred from the QSF to the FinTech anyway, to both activate the $100 Digital Card and pay the "discount" back to the Admin. Apparently, this leaves a "clean" QSF banking record – i.e., showing a $100 claim payment, but not the discount paid to the Admin, and <u>not</u> the breakage."[31]

107.    As the *Forbes* article puts it, "The unused money doesn't go back to the settlement fund or to not-for-profits working in areas related to the suit, as it usually does when paper settlement checks aren't cashed or when a recipient never activates the card."[32] Even more troubling is the fact that "the judges approving settlements and the Plaintiff lawyers representing

---

[30] *See*  https://www.linkedin.com/company/tremendous-rewards/about/ (last visited April 23, 2025).
[31] *Hilsee Report*, *supra* note 1.
[32] *Forbes*, *supra* note 2.

consumers are largely unaware of how the digital cards work, or who is collecting the breakage they generate."[33]

108.    The kickbacks Administrator Defendants receive from digital pay cards and gift cards represent an undisclosed windfall for Administrator Defendants, as they are already being paid in full for providing settlement administration services to the class. So, it is no surprise that Administrator Defendants did not disclose these payments to Plaintiff or Class Members or the courts.

109.    FinTech companies, like the FinTech Defendants, were not shy about this scheme in emails to settlement administrators. Hilsee reports and publishes an email that shows a FinTech company offering to kick some of this money back to the settlement administrator, calling it a "discount" and "additional revenue" if that FinTech company is hired by the settlement administrator for a particular settlement.[34]

110.    The *Forbes* article confirmed through its own reporting that a Blackhawk employee sent the email to Hilsee.[35]

111.    A 2020 email that a settlement administrator shared with Hilsee indicated that a "discount" of between 2% and 3.5% of the QSF money to be distributed to class members on digital cards was being offered by a FinTech company as "additional revenue" to settlement administrators.[36] Hilsee states that he discerned that these "discounts" were offered in "anticipation of the breakage that FinTechs/Banks recapture when consumers do not access (or actively spend the money transferred to them electronically." Hilsee then confirmed in his report

[33] *Id.*
[34] *Hilsee Report*, *supra* note 1; Exhibit 1.
[35] *See Forbes*, *supra* note 2.
[36] *Id.* at 3.

that he could not find any disclosures to the courts responsible for overseeing QSFs that "discounts" were shared back to settlement administrators.

112.     The Hilsee Report discussed that a large bank confirmed that, as alleged throughout this Complaint, QSF money is accepted by settlement administrators in the form of "discounts" from FinTechs in exchange for using their digital card services.[37] Hilsee states that this bank revealed that discount offers or kickbacks from FinTech companies to settlement administrators of 2% to 3.5% from 2020 had grown to 20% due to the scale of breakage from email notices that go unread/unclicked, or forgotten/unused digital cards.[38]

113.     The Hilsee Report continues, that a bank informed him that if a settlement is distributed by what is called a "push" method (*i.e.*, where digital payments are active upon sending an email to a claimant instead of first requiring a "click to activate" process), the breakage may be staggering: upwards of 80-90% of class action QSF money distributed on digital cads may be reclaimed by FinTech/banks –therefore the "discount" or kickbacks to Administrators could be markedly higher.[39] To conceal these payments, on information and belief, Administrator Defendants – or their owners – have created one or more special purpose entities or "SPEs" that receive the undisclosed payments. The existence of these SPEs – and their covert purpose – is not disclosed to Plaintiff, Class Members, or the courts.

114.     Administrator Defendants have failed to turn over the remuneration, compensation and/or incentives from digital payments to the QSFs that they administer, and they have failed to use these payments for the benefit of the Plaintiff and the class by applying them to reduce settlement administration expenses.

---

[37] *Hilsee Report*, *supra* note 1, at 3.
[38] *Id*. at pp. 3-4.
[39] *Id.* at p. 4.

115.    Administrator Defendants have regularly and systematically misrepresented the amount of compensation they would receive by providing class action and mass tort settlement administration services in the bids, estimates, and proposals they provide to Plaintiff and Class Members in order to secure such work, as well as in the contracts, agreements, and engagement letters they have disseminated to class counsel.

116.    Administrator Defendants have provided bids, estimates, and proposals for settlement administrative services to class counsel with the intent and expectation that Plaintiff and Class Members would rely upon such communications. As a result of such reliance, Administrator Defendants have caused numerous class counsel to submit briefs and other materials to various state and federal courts that misstated and underreported the amount of compensation Administrator Defendants would receive by providing settlement administration services by concealing the revenue and earnings that Defendants have received from digital payments.

117.    At all times, Administrator Defendants concealed from Plaintiff, Class Members, and the courts that they would receive substantial kickbacks from issuers of digital payments and that such kickbacks rendered Administrator Defendants' representations about the compensation they would receive for providing settlement administration services materially false and misleading.

118.    Plaintiff, Class Members, and the courts that approved Administrator Defendants' appointments as settlement administrators could not have known or discovered Administrator Defendants' illicit compensation from digital payment companies, such as the FinTech Defendants.

119.    Upon information and belief, FinTech Defendants may have also improperly retained some of the breakage from the use of digital payment cards, which should have gone back

into the respective settlement QSFs. As stated in the *Forbes* article, "the unused [QSF] funds end up lining the pockets of the FinTech companies that issue the card (mainly gift card giant Blackhawk and New York startup Tremendous), the banks they partner with and the very class action administration companies that award the contracts for the digital cards."

### Defendant Tremendous Digital Payments

120.    Defendant Tremendous is one of the biggest issuers of electronic prepaid cards for settlements across the nation. Its website says it has facilitated $350 million in digital payments for 150 cases. On its LinkedIn page, Tremendous boasts, "We handle everything related to international sending, so you can issue rewards to recipients in over 200 countries. And you can give them the gift of choice: we offer 1,000 different redemption options."[40]

121.    Tremendous recognizes the profit entities can obtain from breakage. Indeed, in "a recent filing in the GiftRocket class action case included internal Slack messages from Tremendous executives, including one in which Tremendous' vice president of business operations said GiftRocket had "insane" breakage rates, which is why GiftRocket was profitable and why he considered it a lucrative client for Tremendous."[41]

122.    By way of example only, Defendant Epiq enlisted Defendant Tremendous, a business-to-business issuer of gift cards, to issue digital payments in the settlement of *In Re: Automotive Parts Antitrust Litigation*, No. 12-md-02311 (E.D. Mich.), a multidistrict antitrust class action that has resulted in $1.2 billion in settlements.

123.    There were five rounds of distributions to settlement class members. On information and belief, Epiq has administered each round of settlements and distributions.

---

[40] *See*  https://www.linkedin.com/company/tremendous-rewards/about/  (last visited April 23, 2025).
[41] *See* Forbes, *supra* note 2.

Pursuant to the court's approval, the Round 1 Settlements totaled approximately $225 million; the Round 2 Settlements totaled approximately $379 million; the Round 3 Settlements totaled approximately $433 million; the Round 4 Settlements totaled approximately $184 million, and the Round 5 Settlements totaled $3.154 million.

124.    Epiq digital payments were sent to settlement class members who were eligible for payments from noreply@Epiqpay.com, which provided a "Claim Payment" link to claim their payment. Epiq did not provide any digital payment options other than EpiqPay. Epiq describes EpiqPay as follows:

> EpiqPay is the official digital payment platform for Epiq Class Action and Claims Solutions. EpiqPay offers individuals who are eligible to receive payments in mass actions an easy, convenient, fast, and secure way to claim their payments.[42]

### Defendant Blackhawk Network Digital Payments

125.    Defendant Blackhawk is similarly one of the biggest issuers of electronic prepaid cards for settlements across the nation.

126.    By way of example only, Defendant JND enlisted Blackhawk to issue digital payments in the settlement of *In re: Equifax, Inc. Customer Data Security Breach Litigation*, Case No. 1:17-md-02800-TWT (N.D. Ga.).

127.    Blackhawk is a leading issuer of digital payment cards for so-called "corporate payouts," including class action claims. Blackhawk offers prepaid cards and gift cards, which can be delivered via mail or digitally via email. Numerous class action settlement administrators, including Defendant JND, have adopted digital payment platforms like Blackhawk and Digital Disbursements.

---

[42] *See* https://www.autopartsclass.com/faq (last visited April 23, 2025).

128.    Plaintiff by way of another example only, the Equifax Inc. data breach, which occurred on September 7, 2017, impacted the personal information of about 147 million Americans. More than 300 class actions were filed. Those cases were transferred and consolidated in the U.S. District Court for the Northern District of Georgia.

129.    The Northern District of Georgia appointed JND as the settlement administrator for the Equifax Data Breach Settlement. *See In re Equifax, Inc. Customer Data Security Breach Litigation*, Case No. 1:17-md-02800-TWT, ECF No. 742, p. 5 (N.D. Ga. July 22, 2019) (stating JND "is appointed as the settlement administrator, with responsibility for claim submissions, certain notice functions, and administration pursuant to the terms of the settlement agreement." With respect to compensation, the court stated, "The settlement administrator's fees, as approved by the parties, will be paid from the settlement fund pursuant to the settlement agreement." *Id*.

130.    The *Equifax* case was a massive settlement that provided for a common fund of $380,500,000 for class benefits, attorneys' fees, expenses, service awards, and, pertinent to this matter, notice and administration costs. The settlement further provided for an additional $125,000,000 if needed to satisfy claims for certain out-of-pocket losses, and potentially $2 billion more if all 147 million class members signed up for credit monitoring.

131.    In approving JND, the court noted that the company possessed the capacity to handle the administration of extremely large settlements, including calculating payments, stating:

> The claims administrator, JND, is highly experienced in administering large class action settlements and judgments, and it has detailed the efforts it has made in administering the settlement, facilitating claims, and ensuring those claims are properly and efficiently handled. Among other things, JND has developed protocols and a database to assist in processing claims, calculating payments, and assisting class members in curing any deficient claims. Additionally, JND has the capacity to handle class member inquiries and claims of this magnitude. This factor, therefore, supports approving the relief provided by this settlement.

Amended Final Approval Order, at No. 1:17-md-02800-TWT, at ECF No. 1029, p. 7 (citations to

the record omitted).

132.    Upon information and belief, Plaintiff received first payment from JND in the *Equifax* data breach settlement in 2024. Additionally on May 2, 2025, nearly a year after the initial payment, Plaintiff received an email informing him of an "additional settlement payment by electronic pre-paid card" with no specific amount listed. On September 18, 2025, Plaintiff received another email from JND informing him of an additional payment by electronic pre-paid card.

133.    There is nothing in the record to indicate that the court or Plaintiff, Class Members, were aware that JND and/or a subsidiary thereof would receive kickbacks from Defendant Blackhawk for agreeing to distribute payments using its digital payment platform nor that Defendant Blackhawk would potentially retain part of the QSF in the form of breakage from digital gift cards it issued. As settlement administrator, JND "received in excess of 15 million claims from verified class members." Amended Final Approval Order, No. 1:17-md-02800-TWT at ECF # 1029 (March 17, 2020). Given the large number of claims made in this action and the value of the settlement, the payments from Blackhawk to JND would have been substantial and material to JND's financial results.

### *Defendant Digital Disbursements Payments*

134.    Defendant Digital Disbursements has also issued digital payments for settlements nationwide.

135.    By way of example only, Angeion enlisted Digital Disbursements, a subsidiary of Western, to issue digital payments in the case of *Lundy v. Meta Platforms, Inc*., Case No. 18-cv-6793-JD (N.D. Cal.), a $37.5 million settlement of the location data privacy class action against

Meta Platforms, the parent company of Facebook. Digital Disbursements is yet another issuer of digital payments, including prepaid cards.[43]

136.    In *Lundy v. Meta Platforms, Inc*., Case No. 18-cv-6793-JD (N.D. Cal.), plaintiffs alleged that Meta improperly inferred the location of Facebook users through their IP addresses even if the Facebook user had turned off the Location Services on their phone. The parties reached a settlement pursuant to which Meta would pay $37.5 million for the release of the class's claims.

137.    By order entered on April 26, 2023, the court granted preliminary approval of the settlement and appointed Angeion as the settlement administrator. *Lundy v. Meta Platforms, Inc*., Case No. 18-cv-6793-JD, at ECF No. 199, p. 3. Pursuant to this order, Angeion was required to give notice to the class under the court-approved notice plan, review claims submitted by class members, process claims, and distribute the net settlement fund to the class. *Id*. The cost of the settlement notice and administration was to be paid from the gross settlement fund. *Id*.

138.    On September 5, 2024, class counsel submitted a post-distribution accounting and motion for *cy pres* distribution, which included a declaration for Defendant Angeion, which reported that out of 906,299 claims made by class members, 887,685 payments were distributed to class members by "Digital Method." Administrator's Post Distribution Accounting Report, Case No. 3:18-cv-6793-JD, ECF No. 227-1, p. 2. The total value of Digital Payments Cashed was $28,076,451.57. *Id*. p. 3. Angeion also reported that the total settlement administration costs were $1,254,734.26. *Id*. Although it is believed that Defendant Angeion received kickbacks from Defendant Digital Disbursements for using its digital payment platform to distribute settlement

---

[43] Western Alliance Bank acquired Digital Settlement Technologies, d/b/a Digital Disbursements, in January 2022. *See* https://www.pymnts.com/news/partnerships-acquisitions/2022/western-alliance-buys-payments-platform-digital-disbursements/ (last visited on April 23, 2024).

funds, Defendant Angeion did not disclose receiving any payment from Defendant Digital Disbursements.

***Defendants' Illicit Kickbacks As Exemplified by Specific Settlements***

139.    Concealed from the courts who approved the Administrator Defendants, the amount of their compensation for settlement administration services included additional undisclosed kickbacks they received from the Bank Defendants. The Administrator Defendants thereby received compensation that significantly exceeded the amounts they disclosed to the courts and settlement class members.

140.    As discussed above, Defendants are fiduciaries of the settlement class members in the class actions. Their compensation and terms had to be reviewed and approved by the courts as part of a preliminary approval process, and then as part of the final approval process. None of the Defendants' undisclosed compensations and remunerations were ever submitted for preliminary or final approval by courts, and these illicit gains have never been approved by any court. They remain hidden even today and are the proper subject of discovery in this case.

141.    Other lawsuits allege instances in a number of class actions in which Defendants informed counsel (and the managing courts) that the deposits on the QSF earned less than 0.5% interest, when the market rate on an interest-bearing account was far higher on the deposit.

142.    Given the Defendants' collusion and respective market power in the Settlement Deposit Market, there was no recourse other than to accept those terms. Other lawsuits allege plaintiffs and their counsel were informed by current and former employees of the Bank Defendants, and believe and allege on that basis, that the Bank Defendants paid, and the Administrator Defendants received, at minimum, the difference between the market rate on an

interest bearing account and the interest that the Bank Defendants paid to the class members, including but not limited to, the following cases, in Paragraphs 143 through 161.

   *Epiq*

143.    In each of the following cases, Defendant Epiq and the Bank Defendants – court appointed fiduciaries for the settlement class – reported that the interest earned on the QSF was less than 0.5%, when the market rate on an interest-bearing account was between 4-6% of the deposit. And in fact, the Bank Defendants paid, and Defendant Epiq received remunerations, incentives, and compensation (collectively, as kickbacks) equal to some certain sum of the difference between the market rate for interest bearing accounts and what was actually paid for the QSF.

144.    In the case of *In re: Capital One Consumer Data Security Breach Litigation*, MDL Case No. 1:19md2915 (AJT/JFA), there were approximately 97 million class members. The terms for the settlement class received preliminary approval on February 7, 2022, and the terms received final approval on September 13, 2022.

145.    Defendant Huntington was the trustee bank for the QSF for *In re: Capital One*.

146.    The final interest reported by Defendants Epiq and Huntington on *In re: Capital One* was less than 0.5%, which was far less than the market rate. Defendant Huntington in fact paid a sum certain between the market rate and the reported rate to Defendant Epiq, and this additional remunerations, consideration, and/or compensation was not disclosed by Defendant Epiq or Huntington.

147.    *In the case of Jowharah Hameed-Bolden et al v. Forever 21 Retail, Inc. et al*, C.D. Cal. Case No. 2:18-cv-03019-GW-JPR, there were approximately 500,000 class members. The

terms for the settlement class received preliminary approval on October 21, 2021, and the terms received final approval on October 11, 2022.

148.    The final interest reported by Defendant Epiq and Bank Defendants on *Hameed-Bolden et al v. Forever 21* was less than 0.5%, which was far less than the market rate. Bank Defendants in fact paid a sum certain between the market rate and the reported rate to Epiq, and this additional remunerations, consideration, and/or compensation (collectively, as kickbacks) was not disclosed by Epiq or Bank Defendants.

### *Angeion*

149.    In each of the following cases, Defendant Angeion and the Bank Defendants – court appointed fiduciaries for the settlement class – reported that the interest earned on the QSF was less than 0.5%, when the market rate on an interest-bearing account was between 4-6% of the deposit. And in fact, the Bank Defendants paid, and Defendant Angeion received remunerations, incentives, and compensation (collectively, as kickbacks) equal to some certain sum of the difference between the market rate for interest bearing accounts and what was actually paid for the QSF.

150.    In the case of *Culbertson et al v. Deloitte Consulting LLP*, there were approximately 19,000 class members. The terms for the settlement class received preliminary approval on August 27, 2021, and the terms received final approval on February 16, 2022.

151.    The final interest reported by Angeion and Bank Defendant in *Culbertson et al v. Deloitte Consulting LLP* was less than 0.5%, which was far less than the market rate. Bank Defendants in fact paid a sum certain between the market rate and the reported rate to Angeion, and this additional remunerations, consideration, and/or compensation was not disclosed by Angeion or Bank Defendants.

152.    In the case of *Guarnaschelli et al. v. East River Medical Imaging, P.C.*, there were approximately 455,000 class members. The terms for the settlement class received preliminary approval on June 25, 2024, and the terms received final approval on May 13, 2025.

153.    The final interest reported by Angeion and Bank Defendant in *Guarnaschelli et al. v. East River* was less than 0.5%, which was far less than the market rate. Bank Defendants in fact paid a sum certain between the market rate and the reported rate to Angeion, and this additional remunerations, consideration, and/or compensation was not disclosed by Angeion or Bank Defendants.

154.    *In the case of Stoffers v. Daves Inc.*, 20STCV35381 (LASC) there were approximately 243,000 class members. The terms for the settlement class received preliminary approval on May 17, 2023.

155.    The final interest reported by Angeion and Bank Defendant in *Stoffers v. Daves* was less than 0.5%, which was far less than the market rate. Bank Defendants in fact paid a sum certain between the market rate and the reported rate to Angeion, and this additional remuneration, consideration, and/or compensation was not disclosed by Angeion or Bank Defendants.

### *Western*

156.    In the case of *In re: Yahoo! Inc. Customer Data Security Breach Litigation*, Case No. 5:16-md-02752-LHK (N.D. Cal.), there were approximately 194 million class members. The terms for the settlement class received preliminary approval on July 20, 2019, and the terms received final approval on January 31, 2020.

157.    Defendant Western was the trustee bank for the QSF for *In re: Yahoo*.

158.    In the case of *In re: Yahoo! Inc. Customer Data Security Breach Litigation,* Case No. 5:16-md-02752-LHK (N.D. Cal.), there were approximately 194 million class members. The

terms for the settlement class received preliminary approval on July 20, 2019, and the terms received final approval on January 31, 2020.

159.    The final interest reported by Defendant Western on *In re: Yahoo!* was less than 0.5%, which was far less than the market rate. Defendant Western in fact paid Administrator Defendants a sum certain between the market rate and the reported rate, and this additional remunerations, consideration, and/or compensation was not disclosed by Administrator Defendants or Defendant Western.

160.    In the case of *Smith, et al. v. BHG XXXIV, LLC and BHG Holdings, LLC d/b/a Behavioral Health Group*, there were approximately 197,507 class members. The terms for the settlement class received preliminary approval on June 24, 2024, and the terms received final approval on October 29, 2024.

161.    The final interest reported by Defendant Western on Smith was less than 0.5%, which was far less than the market rate. Defendant Western in fact paid Administrator Defendants a sum certain between the market rate and the reported rate, and this additional remuneration, consideration, and/or compensation was not disclosed by Administrator Defendants or Defendant Western.

### *JND*

162.    Other lawsuits allege that during the relevant period, JND participated in class cases as the settlement administrator and similarly took kickbacks and undisclosed remunerations. JND then stopped taking kickbacks for itself for a period but then started making the demand again more recently.

163.    Other lawsuits allege that JND acted in concert with all Defendants, including the other Administrator Defendants, by at minimum, knowing about the secret kickbacks amongst the

Defendants, and not revealing it to the courts, attorneys, or Class Members. In fact, those lawsuits allege that JND had multiple opportunities to inform the courts, attorneys, and Class Members, but chose not to because of the kickbacks and remunerations they already took. In addition, for bids allegedly against other Administrator Defendants for class action settlements, those lawsuits allege that JND continued to act in concert with the other Administrator Defendants, by keeping its quotes consistent with the other Administrator Defendants and maintaining the return quotes from the Bank Defendants consistent with the scheme.

***Defendants Formed and Used SPEs to Receive the Kickbacks***

164.    Other lawsuits allege that for the aforementioned cases in Paragraphs 143 through 161. – in addition to the vast majority of the cases conducted between the Defendants the last four years – the Bank Defendants paid, and the Administrator Defendants received, the difference between the market rate on an interest bearing account and the interest that the Bank Defendants paid to the class members, through SPEs that the Administrator Defendants formed to receive such kickbacks, and to which the Bank Defendants knowingly paid. And these SPEs – and their covert purpose – were not disclosed to the courts, class members, or settlement class counsel.

165.    Other lawsuits allege that discovery will reveal the actual names of these SPEs, as evidenced by the entities to which the Bank Defendants paid, and the accounts from which the Administrator Defendants (and their principals and co-conspirators) withdrew for their gain and enrichment.

***The Likelihood That the Bank Defendants Will Successfully Maintain Their Market Power and Continue to Suppress Rates and Payouts***

166.    Other lawsuits allege that the plaintiffs and their counsel were informed by current and former employees of the Bank Defendants and that these illegal and anticompetitive

agreements have now been maintained for years, and there is a high likelihood that these practices will continue if the courts do not intervene.

167.    Specifically, Defendants control thousands of class actions, and there are currently no sizeable competitors to the Bank Defendants to threaten their market power.

***Defendants' Fraudulent Conduct***

168.    Throughout the relevant period, Defendants affirmatively and fraudulently concealed their unlawful conduct.

169.    Plaintiff and Class Members and individuals did not discover and could not have discovered, through the exercise of reasonable diligence, the existence of the conspiracy and collusion alleged herein until the first filing of this Complaint. That is because Defendants and their co-conspirators actively and fraudulently concealed the existence of their agreements, combinations, and/or conspiracy. Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiff and Class Members were unaware of Defendants' unlawful conduct alleged herein and did not know that they were receiving artificially low payouts from their class action QSFs.

170.    Defendants engaged in a successful, illegal conspiracy to suppress interest rates and payouts on class action settlements, by actively and affirmatively engaging in the following conduct, at minimum:

(a)    Concealing and failing to disclose their kickbacks and artificial suppression of class action payouts to the reviewing courts;

(b)    Concealing and failing to disclose their kickbacks and artificial suppression of class action payouts to the parties' attorneys of record;

(c)     Concealing and failing to disclose their kickbacks and artificial suppression of class action payouts in the Class Notices to Class Members;

(d)     Concealing and failing to disclose their kickbacks and artificial suppression of class action payments in the Class Websites;

(e)     Concealing and failing to disclose their kickbacks and artificial suppression of class action payments to the Attorney Generals, in the CAFA Notices;

(f)     Concealing and failing to submit their kickbacks and other remunerations arising from the scheme to the reviewing courts, for preliminary and final approval;

(g)     Sending and receiving the kickbacks and other remunerations arising from the scheme through SPE's to further avoid detection; and

(h)     Carrying on the scheme by agreeing to continue suppressing bids and interest rates for new cases brought to them by class action counsel.

171.    Only because Defendants failed to meet the trust that the courts and American public put in them were Defendants allowed to perpetuate the anticompetitive and illegal scheme for so long. At all relevant times, disclosures of these kickbacks and artificial suppression of class settlement payouts were material to the courts, class members, and class counsel. If disclosed, these kickbacks and artificial suppression of class settlement payouts would have gone to the nature of the bargain and been essential aspects of the transaction. No court would have approved any settlement with such kickbacks; the parties to the settlements would demand that the Defendants be fired; the AGs and other regulators would have sought to detain the perpetrators; and the American public and Class Members would have absolutely objected to the kickbacks, as they do now.

# CLASS ALLEGATIONS

172.    Plaintiff brings all counts, as set forth below, individually and as a Class action,

pursuant to the provisions of the Fed. R. Civ. P. 23, on behalf of a Class defined as:

> Class 1 - All persons in the United States who were members of a settlement class in which Defendants provided claims administration services and distributed qualified settlement funds via digital payment cards, gift cards, and prepaid cards and whose distributions from the settlement were reduced in part by remuneration, incentives, or compensation of any kind to the Administrator Defendants.

> Class 2 – All persons in the United States who were members of a settlement class in which (a) the Administrator Defendants provided claims administration services, (b) the Bank Defendants distributed Qualified Settlement Funds pursuant to U.S. Treasury Regulations §1.468B3(e), and (c) whose distributions from the settlement were reduced in part by remuneration, incentives, or compensation of any kind to the Administrator Defendants.

> Class 3 – All persons in the United States who were members of a settlement class in which (a) the Administrator Defendants provided claims administration services, (b) the Bank Defendants distributed Qualified Settlement Funds pursuant to U.S. Treasury Regulations §1.468B3(e), and (c) whose distributions from the settlement were reduced because the Bank Defendants did not pay market interest rates on the deposits for that settlement.

173.    Excluded from the Class are Defendants, their subsidiaries and affiliates, officers

and directors, any entity in which Defendants have a controlling interest, the legal representative,

heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action

is assigned, and the members of their immediate families.

174.    This proposed Class definition is based on the information available to Plaintiff at

this time. Plaintiff may modify the Class definition in an amended pleading or when they move

for Class certification, as necessary to account for any newly learned or changed facts as the

situation develops and discovery gets underway.

175. **Numerosity – Fed. R. Civ. P. 23(a)(1):** The Plaintiff is informed and believes, and thereon allege, that there are, at minimum, hundreds of thousands of members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through Defendants' records.

176. The Class is readily ascertainable from Defendants' business records, which identify the class members of each and every case in which Defendants have served as settlement administrators, and such records also include contact information such as mailing addresses, email addresses, and telephone numbers.

177. **Commonality – Fed. R. Civ. P. 23(a)(2):** This action involves questions of law and fact common to the Class. Such common questions include, but are not limited to:

    (a)    Whether Defendants were fiduciaries with respect to Plaintiff and the Class;

    (b)    Whether Defendants breached their fiduciary duties to Plaintiff and the Class;

    (c)    Whether Defendants breached their contracts for claims administration services;

    (d)    Whether Defendants entered into contracts implied in fact with Plaintiff and the Class;

    (e)    Whether Defendants engaged in fraud by omission;

    (f)    Whether Defendants were engaged in an anticompetitive scheme, in violation of Section 1 of the Sherman Act, 15 U.S.C. §§ 1-7;

    (g)    Whether Defendants violated the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968;

(h)    Whether Defendants were unjustly enriched by receiving undisclosed remuneration, incentives, and compensation;

(i)    Whether the Defendants conspired;

(j)    Whether Plaintiff and Class Members are entitled to damages as a result of Defendants' wrongful conduct; and

(k)    Whether Plaintiff and Class Members are entitled to restitution as a result of the Defendants' wrongful conduct including but not limited to restitution and/or disgorgement.

178.    **Typicality – Fed. R. Civ. P. 23(a)(3):** Plaintiff's claims are typical of the claims of the members of the Class. The claims of the Plaintiff and members of the Class are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiff and the Class were all members of a settlement class in which (a) the Administrator Defendants provided claims administration services and/or (b) the Bank Defendants distributed Qualified Settlement Funds pursuant to U.S. Treasury Regulations §1.468B3(e) and/or the Fintech Defendants supplied improper remuneration, compensation, or incentives, and (c) whose distributions from the settlement were reduced.

179.    **Adequacy of Representation – Fed. R. Civ. P. 23(a)(3):** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the other Class Members Plaintiff seeks to represent; Plaintiff has retained counsel competent and experienced in complex Class action litigation; Plaintiff intends to prosecute this action vigorously; and Plaintiff's counsel have adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed. Furthermore, the interests of the Class Members will be fairly and adequately protected and represented by Plaintiff and Plaintiff's counsel.

180.    **Predominance and Superiority – Fed. R. Civ. P. 23(b)(3):** The proposed Class action is appropriate for certification because questions of law and fact common to the members of the Class predominate over questions affecting only individual members. Also, a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

181.    Defendants have acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

182.    Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

183.    Finally, all members of the proposed Class are readily ascertainable. Defendants have access to Class Members' names, email addresses, and mailing addresses from the class action settlements they administered. Defendants have already preliminarily identified Class Members for the purpose of sending notices of class action settlements and distributing digital payment cards.

## CLAIMS FOR RELIEF

## COUNT I

## BREACH OF FIDUCIARY DUTIES AS TO ADMINISTRATOR DEFENDANTS AND BANK DEFENDANTS

184.    Plaintiff repeats all previous allegations as if set forth in full.

185.    Plaintiff brings this claim individually and on behalf of the Class.

186.    As the court-appointed and/or court-approved mass tort and class action settlement administrator and accompanying trustee bank in numerous cases, Administrator Defendants and Bank Defendants owed Plaintiff and the Class fiduciary duties of prudence, care and loyalty, which subsume an obligation to act in good faith, with candor, and to make accurate material disclosures to the courts, class counsel, Plaintiff and the Class.

187.    At all relevant times, Administrator Defendants and accompanying Bank Defendants were court-approved and duly appointed fiduciaries of QSFs created for the benefit of class members in various class action settlements, in that they exercised discretionary authority or control over the administration and/or management of such QSFs or the disposition of QSFs' assets.

188.    As fiduciaries for Plaintiff and Class Members, Administrator Defendants and Bank Defendants were subject to certain fiduciary duties, including the duties of care and loyalty with respect to managing the assets of QSFs for the sole and exclusive benefit of the Class Members in cases where Defendants served as settlement administrators and escrow agents/banks. In particular, Administrator Defendants were obligated to act with the care, skill, diligence, and prudence under the circumstances that a prudent and loyal person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

189.    Administrator Defendants and Bank Defendants breached these fiduciary duties in multiple respects, as discussed throughout this Complaint. Administrator Defendants and Bank Defendants did not act or make decisions concerning the management of the various QSFs based solely on the interests of the Class Members. Instead, Administrator Defendants and Bank Defendants placed their own financial interests before those of the Class Members by entering into clandestine schemes to obtain benefits that were retained by Administrator Defendants and Bank Defendants and/or their wholly owned subsidiaries, including SPEs, rather than being used to benefit the classes in the settlements Administrator Defendants were charged with administering. Administrator Defendants and Bank Defendants profited off of Plaintiff and Class Members' funds in ways that they did not disclose to Plaintiff and Class Members whom they owed a fiduciary duty.

190.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, Plaintiff and the Class suffered damages in an amount to be determined at trial.

191.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, Plaintiff and the members of the Class were denied the benefit of the revenue generated by using digital payments, which Administrator Defendants and Bank Defendants could have used to offset the costs of settlement administration.

192.    Administrator Defendants and Bank Defendants are liable to restore to each QSF all losses caused by their breaches of fiduciary duties and also must restore any profits Administrator Defendants and Bank Defendants received as a result of such breaches.

193.    In addition, Plaintiff and the Class Members are entitled to equitable relief, including equitable accounting, and other appropriate relief for Administrator Defendants' and Bank Defendants' breaches, as set forth in their Prayer for Relief.

## COUNT II

### FRAUD AS TO THE ADMINISTRATOR DEFENDANTS

194.    Plaintiff repeats all previous allegations as if set forth in full.

195.    Plaintiff brings this claim individually and on behalf of the Class.

196.    Administrator Defendants are responsible for sending class settlement notices to Class Members. These Class Settlement Notices may be transmitted by U.S. mail or email and are administered by the Administrator Defendants. In addition, the Administrator Defendants also set up Class Settlement Websites that detail the class action settlements. These websites are usually set up before the motion for preliminary approval hearing.

197.    For both the Class Settlement Notices and Class Settlement Websites, each and every material detail regarding the settlement is supposed to be provided to the Class Members, so that they can decide if they want to make a claim, ask questions, or otherwise object. The reason why the courts require such notices is so Class Members can review, participate, and object to settlement distributions if they so choose. Thus, the secret remunerations, incentives, and compensations received by the Administrator Defendants needed to be disclosed in these notices and disclosures, as the kickbacks materially affected the settlements as it goes to the nature of the bargain and goes to the essential aspects of the transaction. That any party was receiving significant percentages of the settlement proceeds needed to be identified in the Class Settlement Notices and Class Settlement Websites, as such compensation is ultimately paid out of the gross settlement proceeds and diminish the amount of money available to compensate the Class Members in such cases.

198.    Yet, in each and every Class Settlement Notice and Class Settlement Website, none of the secret remunerations, incentives, and compensations received by the Administrator Defendants were ever disclosed.

199.    Further, for each and every settlement presented to the courts for preliminary and final approval, no discussion of the additional remunerations, incentives, or compensations received by the Administrator Defendants were presented for approval, because no one other than the Defendants were aware of the secret transactions, deals, or agreements. Similarly, there was no disclosure of the anticompetitive conduct between the Defendants as detailed below in Counts III and IV which shall be incorporated herein.

200.    The Administrator Defendants not only failed to disclose these material remunerations, incentives, and compensations and their anticompetitive conduct between the Defendants but the Administrator Defendants also affirmatively falsely represented to Plaintiff, Class Members, and the courts the compensation they were receiving for providing settlement administration services in class actions.

201.    At all times relevant to this action, the amount of compensation paid to a settlement administrator was material to Plaintiff and Class Members in its selections of settlement administrators because this compensation would be paid out of the gross settlement proceeds and diminish the amount of money available to compensate the Plaintiff and the classes in such cases.

202.    At all times relevant to this action, Administrator Defendants knew or recklessly disregarded the falsity of their representations in their bids, proposals, agreements, and contracts concerning the compensation they would receive for providing settlement administration services in class actions and mass tort cases.

203.    At all times relevant to this action, Administrator Defendants intended to deceive Plaintiff and Class Members in the decision-making process for selecting settlement administrators and to deceive the courts in the approval process for settlement administration, how and what payments are made from the QSFs, and whether the courts would ultimately approve the final

distributions. And the Administrators did so in order to obtain money or property that otherwise belonged to Plaintiff and Class Members.

204.    Administrator Defendants intended to induce Plaintiff, Class Members, and courts to approve or not object to the settlements on the terms the Administrator Defendants wanted, relying on the Administrator Defendants' false and misleading statements and omissions concerning the compensation they would receive for providing settlement administration services in class actions.

205.    Plaintiff and Class Members and the approving court, in fact, relied upon Administrator Defendants' omissions and/or false and misleading statements concerning the compensation they would receive for providing settlement administration services in class actions and mass tort cases, and on the basis of such misrepresentations, selected Administrator Defendants as the settlement administrators for dozens if not hundreds of class actions and mass tort cases. Had Plaintiff and Class Members and the courts known, the Administrator Defendants would have never been selected or would have been selected but on materially different terms.

206.    Plaintiff and Class Members' and the approving court's reliance on Administrator Defendants' omissions and/or false and misleading statements concerning the compensation they would receive for providing settlement administration services in class actions and mass tort cases was at all times reasonable. Indeed, no amount of diligence on the part of Plaintiff and the Class Members and the approving court would have revealed Defendants' deceptive scheme.

207.    Reliance upon Administrator Defendants' omissions and/or false and misleading statements concerning the compensation they would receive for providing settlement administration services in class actions and mass tort cases caused actual financial harm and damage to Plaintiff and the Class Members in thousands of cases. At minimum, Plaintiff and Class

Members would have received greater recoveries in such settlements if the kickbacks that the Administrator Defendants had been used to offset settlement administration expenses, rather than to line Administrator Defendants' own pockets.

208.    As a direct and proximate result of Administrator Defendants' fraudulent conduct, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## COUNT III

### VIOLATION OF THE SHERMAN ACT, SECTION 1 (ADMINISTRATOR DEFENDANTS)

209.    Plaintiff repeats all previous allegations as if set forth in full.

210.    Plaintiff brings this claim individually and on behalf of the Class.

211.    Beginning sometime in 2021, the exact date being unknown to the Plaintiff and Class Members, being exclusively within the knowledge of Defendants, the Administrator Defendants and their co-conspirators entered into a continuing contract, combination, and/or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

212.    The Administrator Defendants agreed with each other that they would implement a scheme to raise, fix, maintain, or stabilize the cost of class action settlement administration services.

213.    Each Administrator Defendant proceeded to act accordingly, in concert with one another. Indeed, during the times relevant, each of them made such demands on the Bank Defendants, received illegal and unfair remunerations from the Bank Defendants, and proceeded to hide these illicit transactions for themselves, and for each other. The fact that the Administrator Defendants have been acting in concert to keep the kickbacks secret is easily evidenced by how

little courts knew about these clandestine practices, and how the Administrator Defendants have been received the remunerations in SPEs.

214. Amongst the important effects of these concerted actions by the Administrator Defendants is that it raised the price of class action settlement administration services and lowered the total payouts to Plaintiff and Class Members. Had the secret remunerations to the Administrator Defendants not been made, the money would have either reduced the costs of administration, or more money would have been paid out to Plaintiff and Class Members.

215. As a result of Defendants' unlawful conduct, the cost of class action administrator in the Administrator Market in the United States have been raised, fixed, maintained, or stabilized.

216. The contract, combination, and/or conspiracy amongst Defendants consisted of a continuing agreement, understanding, and concerted action among the Administrator Defendants and their co-conspirators.

217. For purposes of formulating and effectuating their contract, combination, and/or conspiracy, the Administrator Defendants and their co-conspirators did those things they contracted, combined for, and conspired to do, including:

    (a)    Participating in meetings and conversations to discuss the costs and payments of class action settlement administration;

    (b)    Communicating orally and in writing to fix the costs on class action settlement administration;

    (c)    Agreeing to manipulate the payouts and costs of class action administration in the United States, in a manner that deprived Class Members and the country of free and open competition;

    (d)    Issuing quotes and bids in accordance with the agreements reached;

(e)     Selling class administration services, including services for the Administrator Market, at noncompetitive prices;

(f)     Providing false statements to the public, including the courts, the AGs, the parties' attorneys, and the Class Members, regarding the noncompetitive prices of class action administration and the subsequent payouts; and

(g)     Helping to set up and paying the kickbacks into SPEs to receive the payments.

218.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff and Class Members have been injured in that they paid more for settlement administration services than they needed to, and received less payouts than they otherwise would have, in an amount to be proven at trial.

219.    In addition to being per se unlawful, there is and was no legitimate, non-pretextual, pro-competitive business justification for Defendants' agreement that outweighs its harmful effect on Plaintiff and Class Members and on competition.

## COUNT IV

### VIOLATION OF THE SHERMAN ACT, SECTION 1 (BANK DEFENDANTS)

220.    Plaintiff repeats all previous allegations as if set forth in full.

221.    Plaintiff brings this claim individually and on behalf of the Class.

222.    Beginning sometime in 2021, the exact date being unknown to the Plaintiff and Class Members, being exclusively within the knowledge of Defendants, the Bank Defendants and their co-conspirators entered into a continuing contract, combination, and/or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

223.    In particular, Defendants have combined and conspired to depress, fix, maintain, or stabilize the payouts on class action settlements in the Settlement Deposit Market in the United States.

224.    As a result of Defendants' unlawful conduct, the payouts on class action settlements the Settlement Deposit Market in the United States have been depressed, fixed, maintained, or stabilized.

225.    The contract, combination, and/or conspiracy amongst Defendants consisted of a continuing agreement, understanding, and concerted action among the Bank Defendants and their co-conspirators.

226.    For purposes of formulating and effectuating their contract, combination, and/or conspiracy, the Bank Defendants and their co-conspirators did those things they contracted, combined for, and conspired to do, including:

(a)    Participating in meetings and conversations to discuss the payouts on class action settlements;

(b)    Communicating orally and in writing to fix the payouts on class action settlements;

(c)    Agreeing to manipulate the payouts of QSFs and the costs of class action administration in the United States, in a manner that deprived Class Members and the country of free and open competition;

(d)    Issuing quotes and bids in accordance with the agreements reached;

(e)    Selling class administration services, including services for the Settlement Deposit Market, at noncompetitive prices;

(f)    Providing false statements to the public, including the courts, the AGs, the parties' attorneys, and the Class Members, regarding the noncompetitive prices and payouts on QSFs; and

(g)    Helping to set up and paying the kickbacks into SPEs to receive the payments.

227.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff and Class Members have been injured in that they paid more for class actions than they needed to, and received less payouts than they otherwise would have, in an amount to be proven at trial.

228.    In addition to being per se unlawful, there is and was no legitimate, non-pretextual, pro-competitive business justification for Defendants' agreement that outweighs its harmful effect on Plaintiff and Class Members and on competition.

## COUNT V

### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, SECTION 1962(C) and 1964(C) (ALL DEFENDANTS)

229.    Plaintiff repeats all previous allegations as if set forth in full.

230.    Plaintiff brings this claim individually and on behalf of the Class.

231.    Defendants, as well as others known and unknown, are "persons" within the meaning of 18 U.S.C. § 1961(3) as entities capable of holding a legal or beneficial interest in property.

232.    The Defendants, as well as others known and unknown, associated together and engaged in racketeering practices for the common purpose of accomplishing the actions described within this complaint, including but not limited to: providing the Administrator Defendants with additional and undisclosed proceeds in the form of interest payments in exchange for the Administrator Defendants depositing the QSFs with the Bank Defendants, all while concealing

this conduct from courts approving the settlements, the class members, and class counsel; maintaining market share and power through anticompetitive means for the Administrator Defendants and Bank Defendants; among other unlawful purposes discussed herein ("Defendants' Enterprise").

233.   Enterprise Defendants had a systemic linkage to each other participant through corporate ties, contractual relationships, and employment relationships, and functioned as a continuing unit for the purpose of furthering the scheme and their common purposes.

234.   Defendants' Enterprise engaged in and affected interstate commerce, where Defendants utilized phone, email, and mail in caring out its purpose, including but not limited to through notices sent to class members, payments made to class members, communications with the approving court and class counsel.

235.   Defendants' Enterprise engaged in the following pattern of racketeering activity, contrary to the provisions of 18 U.S.C. §§ 1962(c):

236.   Wire and mail fraud in violation of 18 U.S.C. § 1343 and conspiracy to commit wire and mail fraud in violation of 18 U.S.C. § 1343 as alleged in Count II. The wires and mailings used in furtherance of Defendants' fraud scheme include but are not limited to:

(a)   Emails and mailed communications to class members involved in the settlements described herein.

(b)   Emails and mailings between Administrator Defendants and Bank Defendants relevant to the settlements described herein.

(c)   Emails, mailings, and uploads of communications by the Administrator Defendants and Bank Defendants to the court (directly or indirectly).

237.    Plaintiff and counsel are informed, and on that basis believe and allege, that the Defendants' Enterprise and pattern of racketeering activity has been happening in the United States interstate commerce since at least 2021, continuing through the present.

238.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff and Class Members sustained injury to their property in that they paid more for class actions than they needed to, received less class settlement payouts than they otherwise would have, and were fraudulent induced to part with their property interest, all in an amount to be proven at trial.

239.    Other lawsuits allege that the plaintiffs and their counsel were informed by current and former employees of the Bank Defendants that the foregoing racketeering activity is ongoing and related. The Defendants amongst them control thousands of class actions, and continue to make ongoing material misrepresentations, misstatements, and omissions alleged within this Complaint. For example, prior to the filing of this Complaint, the Administrator Defendants continued to recommend the two Bank Defendants, explaining that there are no other viable alternatives of scale for the handling of QSFs. And as of the day of the filing of this Complaint, the quoted interest rate on QSF deposits from Defendants remains less than 0.5% per year, although the federal window interest rate is now 4.33%.

240.    Although there have been no criminal convictions of Defendants, Plaintiff and counsel are informed, and on that basis believe and allege, that there will be criminal prosecution of Defendants.

## **COUNT VI**

**VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) — CONSPIRACY 18 U.S.C. 1962(D) (ALL DEFENDANTS)**

241.    Plaintiff repeats all previous allegations as if set forth in full.

242.    Plaintiff brings this claim individually and on behalf of the Class.

243.    Each Defendant and member of the Defendants' Enterprise agreed to commit the substantive racketeering offense through agreeing to participate in two racketeering acts.

244.    Each Defendant and member of the Defendants' Enterprise agreed to commit the substantive racketeering offense through agreeing to participate in two racketeering acts.

245.    Each Defendant and member of the Defendants' Enterprise knew the general status of the conspiracy was to enable and cover up the Defendants' Enterprise and its purpose.

246.    Each Defendant and member of the Defendants' Enterprise knew the conspiracy extended beyond their individual role.

247.    Each Defendant and member of the Defendants' Enterprise agreed and conspired to violate 18 U.S.C. § 1962(c) as set forth above in Count IV.

248.    Each Defendant and member of Defendants' Enterprise knew their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above constituting a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

## COUNT VII

### NEGLIGENT MISREPRESENTATION AS TO THE ADMINISTRATOR DEFENDANTS

249.    Plaintiff repeats all previous allegations as if set forth in full.

250.    Plaintiff brings this claim individually and on behalf of the Class.

251.    For purposes of this count only, in the alternative, Plaintiff specifically disclaims any allegations of fraud and alleges only negligence.

252.    As set forth herein, each of the Administrator Defendants had a duty to fully and truthfully disclose the compensation they would receive for providing settlement administration

services in class actions and mass tort cases in their bids, proposals, agreements, and contracts for providing settlement administration services.

253.    In breach of this duty, Administrator Defendants omitted and/or falsely represented the compensation they would receive for providing settlement administration services in class actions and mass tort cases in their bids, proposals, agreements, and contracts for providing settlement administration services. In particular, Administrator Defendants omitted and failed to disclose the compensation they would receive in the form of kickbacks.

254.    At all times relevant to this action, the amount of compensation paid to a settlement administrator was material Plaintiff and Class Members in selections of settlement administrators because this compensation would be paid out of the gross settlement proceeds and diminish the amount of money available to compensate the Plaintiff and Class Members in such cases.

255.    At all times relevant to this action, Administrator Defendants negligently disregarded the falsity of their representations in their bids, proposals, agreements, and contracts concerning the compensation they would receive for providing settlement administration services in class actions and mass tort cases.

256.    As alleged herein, Administrator Defendants made multiple omissions and/or false and misleading representations of material facts that they should have known were incorrect and misleading.

257.    Settlement Administrator Defendants occupied a special position of confidence and trust such that Plaintiff and Class Members and the courts' reliance on their statements was, at all times, reasonable and foreseeable. Put another way, Administrator Defendants had a duty to speak truthfully and with care in these circumstances, where the relationship is such that, in moral and

good conscience, Plaintiff and Class Members and the courts had the right to rely on Administrator Defendants for accurate and correct information, and their reliance was reasonable.

258.    Administrator Defendants knew or should have known that Plaintiff and Class Members and the courts would rely on their omissions and/or false and misleading statements concerning the compensation they would receive for providing settlement administration services in class actions and mass tort cases.

259.    Plaintiff and Class Members and the courts did, in fact, rely upon Administrator Defendants' omissions and/or false and misleading statements and omissions concerning the compensation they would receive for providing settlement administration services in class actions and mass tort cases, and on the basis of such misrepresentations, selected Administrator Defendants as the settlement administrators for dozens if not hundreds of class actions and mass tort cases.

260.    Plaintiff and Class Members' and the courts' reliance on Administrator Defendants' omissions and/or false and misleading statements concerning the compensation they would receive for providing settlement administration services in class actions and mass tort cases was at all times reasonable. Indeed, no amount of diligence on the part of Plaintiff and Class Members or the courts would have revealed the falsity of Administrator Defendants' omissions and/or misrepresentations.

261.    Reliance upon Administrator Defendants' omissions and/or false and misleading statements concerning the compensation they would receive for providing settlement administration services in class actions and mass tort cases caused actual financial harm and damage to Plaintiff and the Class Members in thousands of cases. Plaintiff and the Class Members would have received greater recoveries in such settlements if the compensation that Administrator

Defendants received had been used by Administrator Defendants to offset settlement administration expenses rather than to line Administrator Defendants' own pockets.

262.    As a direct and proximate result of Administrator Defendants' negligent conduct, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## COUNT VIII

### NEGLIGENCE AS TO THE ADMINISTRATOR DEFENDANTS

263.    Plaintiff repeats all previous allegations as if set forth in full.

264.    Plaintiff brings this claim individually and on behalf of the Class.

265.    Administrator Defendants owed a duty to Plaintiff and Class Members to exercise reasonable care in managing and administering QSFs in mass tort and class action settlements.

266.    Administrator Defendants' duty to use reasonable care arose from several sources, including but not limited to those described below.

267.    Administrator Defendants had a common law duty to manage and administer mass tort and class action settlements with reasonable care. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any improper practices on the part of the Administrator Defendants. By receiving payments from the proceeds of settlements of mass tort and class action settlements for their companies, Administrator Defendants were obligated to act with reasonable care in their management and administration.

268.    Administrator Defendants' duty also arose from the fact that they hold themselves out as a trusted provider of class action administration services and thereby assume a duty to reasonably manage QSFs.

269.    Administrator Defendants breached the duties owed to Plaintiff and Class Members and were thus negligent. Administrator Defendants breached their duties through the acts and omissions alleged herein.

270.    But for Administrator Defendants' wrongful and negligent breach of their duties owed to Plaintiff and Class Members, the costs of administering the class action settlements in which they participated would have been substantially less than the amounts Administrator Defendants charged.

271.    As a direct and proximate result of Administrator Defendants' negligence, Plaintiff and Class Members have suffered financial loss.

272.    As a direct and proximate result of Administrator Defendants' negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## COUNT IX

### BREACH OF IMPLIED CONTRACT AS TO THE ADMINISTRATOR DEFENDANTS AND BANK DEFENDANTS

273.    Plaintiff repeats all previous allegations as if set forth in full.

274.    Plaintiff brings this claim individually and on behalf of the Class.

275.    As fiduciaries for the Plaintiff and Class Members, duly appointed by the courts, Administrator Defendants and Bank Defendants agreed to (a) seek approval for their compensation, and (b) provide a full accounting, as part of the preliminary and final approval process.

276.    At all relevant periods, Administrator Defendants and Bank Defendants breached this implied agreement, arising from the class action approval process.

277.    For both the Class Settlement Notices and Class Settlement Websites, each and every material detail regarding the settlement is supposed to be provided to the Class Members, so that they can decide if they want to make a claim, ask questions, or otherwise object. The reason why the courts require such notices is so Class Members can review, participate, and object to settlement distributions if they so choose. Thus, the secret remunerations, incentives, and compensations received by the Administrator Defendants needed to be disclosed in these materials, as the kickbacks materially affected the settlements. That a party was to receive significant percentages of the settlement proceeds needed to be identified in the Class Settlement Notices and Class Settlement Websites, as such compensation is ultimately paid out of the gross settlement proceeds and diminish the amount of money available to compensate the Class Members in such cases.

278.    Administrator Defendants and Bank Defendants failed to make these disclosures or to seek approval, thereby breaching the agreement. In each and every Class Settlement Notice and Class Settlement Website, none of the secret remunerations, incentives, and compensations received by the Administrator Defendants was ever disclosed. For each and every settlement presented to the courts for preliminary and final approval, no discussion of the additional remunerations, incentives, or compensations received by the Administrator Defendants were presented for approval by anyone, because no one other than the Administrator Defendants and Bank Defendants were aware of the secret transactions.

279.    As a direct and proximate result of Administrator Defendants' breach of contract, Plaintiff and Class Members are entitled to damages, including compensatory, equitable, punitive, and/or nominal damages, in an amount to be proven at trial.

## COUNT X

**UNJUST ENRICHMENT/QUANTUM MERUIT AS TO ALL DEFENDANTS**

280.    Plaintiff repeats all previous allegations as if set forth in full.

281.    Plaintiff brings this claim individually and on behalf of the Class.

282.    As fiduciaries for the Plaintiff and Class Members, duly appointed by the courts, Defendants agreed to (a) seek approval for their compensation, and (b) provide a full accounting, as part of the preliminary and final approval process.

283.    At all relevant periods, Defendants breached this responsibility imposed by law.

284.    For both the Class Settlement Notices and Class Settlement Websites, each and every material detail regarding the settlement is supposed to be provided to the Class Members, so that they can decide if they want to make a claim, ask questions, or otherwise object. The reason why the courts require such notices, is so Class Members can review, participate, and object to settlement distributions if they so choose. Thus, the secret remunerations, incentives, and compensations received by the Administrator Defendants needed to be disclosed in these materials, as the kickbacks materially affected the settlements. That a party was to receive significant percentages of the settlement proceeds needed to be identified in the Class Settlement Notices and Class Settlement Websites, as such compensation is ultimately paid out of the gross settlement proceeds and diminish the amount of money available to compensate the Class Members in such cases.

285.    Defendants failed to make these disclosures or to seek approval and made false disclosures of what the Administrator Defendants would receive as compensation, thereby breaching the agreement. In each and every Class Settlement Notice and Class Settlement Website, none of the secret remunerations, incentives, and compensations received by the Administrator

Defendants was ever disclosed. For each and every settlement presented to the courts for preliminary and final approval, no discussion of the additional remunerations, incentives, or compensations received by the Administrator Defendants were presented for approval by anyone, because no one other than the Defendants were aware of the secret transactions.

286.    Defendants either benefited financially from the improper conduct alleged herein, including but not limited to the illicit and undisclosed compensation or remuneration Defendants received from digital payment transactions that were unjust in light of Defendants' bad faith conduct.

287.    Plaintiff and the Class seek restitution from Defendants and seek an order from this Court disgorging all profits, including from payments paid and obtained by the Defendants due to their wrongful conduct.

288.    Plaintiff and the Class have no adequate remedy at law.

## COUNT XI

## CONSPIRACY AS TO ALL THE DEFENDANTS

289.    Plaintiff repeats all previous allegations as if set forth in full.

290.    Plaintiff brings this claim individually and on behalf of the Class.

291.    Defendants conspired and agreed among themselves to defraud Plaintiff and Class Members through a scheme involving improper retention of QSF funds and kickbacks, and omissions and/or fraudulent misrepresentations about pricing and improper retention of portions of the QSFs in settlements nationwide.

292.    Defendants agreed to participate in a coordinated scheme to deceive Plaintiff and Class Members about the true nature of their business relationships, pricing, kickbacks, and improper retention of QSF funds.

293.    Defendants knowingly and intentionally agreed to participate in the conspiracy with the intent to induce Plaintiff and Class Members to purchase settlement administration services at artificially inflated prices and improperly retain portions of the QSF without disclosing it to Plaintiff, Class Members, or the Court.

294.    Plaintiff and Class Members reasonably relied on Defendants' omissions and misrepresentations about pricing, independent business operations, and distributions of QSF.

295.    Defendants actively concealed their conspiracy by: disguising kickback payments as legitimate business expenses; failing to disclose the kickback payments and improper retention of QSFs.

296.    As a direct and proximate result of the conspiracy, Plaintiff and Class Members suffered damages in an amount to be proven at trial.

## COUNT XII

### AIDING AND ABETTING AS TO BANK DEFENDANTS AND FINTECH DEFENDANTS

297.    Plaintiff repeats all previous allegations as if set forth in full.

298.    Plaintiff brings this claim individually and on behalf of the Class.

299.    At all times relevant herein, the Administrator Defendants engaged in a scheme to violate common law torts, breach fiduciary duties, and commit fraud by receiving illegal kickbacks, improperly retaining QSF proceeds in exchange for giving the FinTech Defendants and Bank Defendants business.

300.    The FinTech Defendants and Bank Defendants knowingly and substantially assisted the Administrator Defendants in committing these violations by: (a) processing and facilitating payments disguised as appropriate fees; (b) providing services while knowing the

payments were illegal kickbacks; and (c) failing to disclose the illicit payments/fees to the Plaintiff, Class Members, and the Courts.

301.    The FinTech Defendants and Bank Defendants had actual knowledge of Administrator Defendants' illegal schemes, including knowledge that: (a) the payments were made in exchange for business rather than for legitimate services; (b) the arrangement violated applicable laws; (c) the scheme was designed to defraud Plaintiff and Class Members.

302.    Alternatively, FinTech Defendants and Bank Defendants acted with deliberate indifference or willful blindness to obvious signs that Administrator Defendants were engaged in illegal activities.

303.    Fintech Defendants' and Bank Defendants' assistance was substantial and material to the success of the scheme, without which Administrator Defendants could not have effectively carried out the violations.

304.    As a direct and proximate result of FinTech Defendants' and Bank Defendants' aiding and abetting conduct, Plaintiff and the Class Members have suffered damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, pray for relief as follows:

(a)    For an Order certifying this action as a Class action and appointing Plaintiff as Class Representative and his counsel as Class Counsel;

(b)    For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the solicitation and receipt of kickbacks from digital payment companies;

(c)    For equitable relief compelling Defendants to utilize appropriate methods and policies with respect to digital payments;

(d)    For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct;

(e)    For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

(f)    For an award of punitive damages, as allowable by law;

(g)    For an award of attorneys' fees and costs, and any other expenses, including expert witness fees;

(h)    Pre- and post-judgment interest on any amount awarded; and

(i)    Such other and further relief as this Court may deem just and proper.

## JURY DEMAND

A jury trial is demanded by Plaintiff on all claims so triable.

Date: November 7, 2025          By:    */s/ Douglas A. Dellaccio, Jr.*
                                       Douglas A. Dellaccio, Jr. (ASB- 4578-l75D)
                                       Hunter M. Phares (ASB-5406-G38V)
                                       **CORY WATSON, P.C.**
                                       2131 Magnolia Avenue South
                                       Birmingham, AL 35205
                                       Telephone: (205) 328-2200
                                       Facsimile: (205) 324-7896
                                       ddellaccio@corywatson.com
                                       hphares@corywatson.com

                                       Darla LaShay Persall (ASB-5360-C63W)
                                       **SHAY PERSALL LAW, LLC**
                                       611 7th Street SW
                                       Cullman, AL 35055
                                       Telephone: (256) 841-7800
                                       Facsimile: (256) 841-7808
                                       shay@persalllaw.com

                                       *Attorneys for Plaintiff and the Proposed Class*